Copy hand-delivered
to chambers

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

U.S. DISTRICT COURT
EASTERN DISTRICT
FILED
2013 SEP 10 A 9: 50
JON W. SANFILIPPI
CLERK

UNITED STATES OF AMERICA,

    Plaintiff,

v.    Case No. 13-CR-005

ANTONIO "TONY" CHAKONAS,

    Defendant.

## PLEA AGREEMENT

1.    The United States of America, by its attorneys, James L. Santelle, United States Attorney for the Eastern District of Wisconsin, and Matthew L. Jacobs, Assistant United States Attorney, and the defendant, Antonio "Tony" Chakonas, individually and by his attorney, Martin J. Pruhs, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.    The defendant has been charged in a nine-count indictment with wire fraud (counts 1 - 3), mail fraud (counts 4 - 6), and transporting in interstate commerce property that had been stolen, converted, and taken by fraud (counts 7 - 9), in violation of Title 18, United States Code, Sections 1343, 1341, and 2314, respectively.

3.    The defendant has read and fully understands the charges contained in the indictment and fully understands the nature and elements of the crimes with which he has been charged. Further, these charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4. The defendant voluntarily agrees to plead guilty to the charge of mail fraud set forth in count five of the indictment, which is set forth below.

### Allegations common to all counts

### THE GRAND JURY CHARGES:

1. Beginning in approximately December 2008, and continuing thereafter until approximately March 2011, the exact dates being unknown to the grand jury, in the State and Eastern District of Wisconsin, and elsewhere, including Chicago, Illinois,

### ANTONIO "TONY" CHAKONAS

devised and carried out a scheme to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises (the "scheme"), which scheme is described more fully below.

2. For purposes of executing his scheme, Chakonas used and caused the use of the United States mail and interstate wire communications, including long-distance telephone calls and e-mails.

### The Scheme

3. Chakonas's scheme to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises was essentially as follows:

    a. Chakonas, who was employed at a jewelry business located in Milwaukee, Wisconsin, used his position at the business to fraudulently obtain and convert jewelry and other property.

    b. Chakonas falsely represented that he would sell and arrange for the sale of the property on behalf of the owner and provide the owner with the proceeds of the sale.

    c. Chakonas fraudulently obtained jewelry from third parties by falsely representing that he would deliver the jewelry to the owner, her representative, and to other parties at the owner's direction.

    d. Chakonas sold, attempted to sell, and otherwise disposed of the jewelry and other property he had obtained fraudulently and converted.

2

  e. Chakonas falsely represented to auction businesses and other third parties that the property belonged to him, his relatives, and an associate of his, and that he was authorized to sell the property.

  f. Chakonas retained and spent proceeds from the sale of property he had fraudulently obtained and converted.

### COUNTS 4 - 6
(Mail fraud: 18 U.S.C. § 1341)

**THE GRAND JURY FURTHER CHARGES:**

6. All of the allegation set forth above in paragraphs 1 - 3 of this indictment are incorporated in support of the following charges as if set forth in full here.

7. On or about the date indicated, in the State and Eastern District of Wisconsin, and elsewhere,

**ANTONIO "TONY" CHAKONAS,**

for the purpose of executing his scheme and attempting to do so, knowingly used and caused the use of the United States mail in the manner described.

| Count | Date | Use of U.S. mail |
|---|---|---|
| Five | November 24, 2010 | A check in the amount of $10,722.50, payable to Chakonas, sent by U.S. mail from an auction business in Chicago, Illinois, to Milwaukee, Wisconsin, representing the net proceeds from the sale of property Chakonas provided to the auction business to sell. |

All in violation of Title 18, United States Code, Section 1341.

5. The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense charged in count five of the indictment. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the following facts beyond a

3

reasonable doubt. The defendant admits to the following facts and that these facts establish his guilt beyond a reasonable doubt:

During the period from approximately 2007 through January 2011, the defendant, Antonio Chakonas, who is also known as Tony, was employed at Lake Hill House, a private jewelry business located in Whitefish Bay, Wisconsin. Lake Hill House is owned by Cynthia Stoll. Through this employment met Father Sereno Baiardi, a Franciscan priest who operated the Franciscan Mission, Inc., located in Burlington. In December 2008, Stoll agreed to assist Father Baiardi in attempting to sell several pieces of Asian art, consisting primarily of carved ivory, jade, and other semi-precious stone.

In connection with assisting in selling the Asian art pieces, in March 2009, Chakonas took 17 pieces of Asian art belonging to the Franciscan Mission to Leslie Hindman Auctioneers, which is an auction business located in Chicago, Illinois. At that time, Chakonas told representative of Leslie Hindman Auctioneers that he was working on behalf of Lake Hill House and selling the pieces on behalf of Franciscan monks. Nonetheless, Chakonas provided his personal e-mail and phone number to the auction business.

The Asian art items were sold by Leslie Hindman Auctioneers at three auctions taking place during the period from August 2010 through January 2010. On or about September 24, 2010, Leslie Hindman Auctioneers mailed a check in the amount of $5,920.95, representing the net proceeds from the first auction, to Lake Hill House. Chakonas obtained this check and deposited it to his personal bank account and spent the money on personal expenses.

On November 23, 2010, Chakonas contacted Leslie Hindman Auctioneers and directed them to send future proceeds checks to his personal address and make the check payable to him personally.

4

As a result, on or about November 24, 2010, Leslie Hindman Auctioneers mailed a check, in the amount of $10,722.50, representing the net proceeds from the second auction of the Asian art items, to Chakonas' personal residence in Milwaukee. The check was payable to Tony Chakonas and sent by U.S. mail. This mailing forms the basis of the charge contained in count five of the indictment, to which Chakonas has agreed to plead guilty. Chakonas deposited the check into his personal bank account and spent the funds on personal expenses.

On February 10, 2011, Chakonas sent an e-mail from Milwaukee to a representative of Leslie Hindman Auctioneers reiterating his direction that any proceeds checks from the sale of the Asian art items should be mailed to his personal residence and be made payable to him personally. As a result, on or about February 18, 2011, Leslie Hindman Auctioneers mailed a check, in the amount of $2,385.50, representing the net proceeds from the third and final auction of the Asian art items, to Chakonas' personal residence in Milwaukee. Consistent with Chakonas' direction, the check was payable to Tony Chakonas. Again, Chakonas deposited the check into his personal bank account and spent the funds on personal expenses.

When asked by Stoll about the status of the Asian art items, Chakonas stated the items had not been sold yet. Chakonas never informed Stoll that the items had been sold and never disclosed that he had received proceeds from the sale of the items and deposited the proceeds into his personal bank account.

During this same period, Chakonas used his position at Lake Hill House to take possession of 11 pieces of jewelry that had been purchased by Sujata Sachdeva but left at Lake Hill House. During the period from approximately 1999 through 2009, Ms. Sachdeva, who had been the vice president of finance at the Koss Corporation, used her position to embezzle approximately $34

5

million from Koss. Ms. Sachdeva used these embezzled funds to purchase expensive women's clothing, shoes, and jewelry, including the jewelry at Lake Hill House.

Ms. Sachdeva's fraud was discovered in December 2009, when she was confronted by the FBI and arrested. In July 2010, Ms. Sachdeva pleaded guilty to six counts of wire fraud. On November 17, 2010, Ms. Sachdeva was sentenced to 11 years in prison.

In approximately October 2010, Chakonas agreed to retrieve the jewelry Ms. Sachdeva had purchased but left at Lake Hill House, as well as jewelry Ms. Sachdeva had purchased with embezzled funds and left at a second jewelry store. The total purchase price for this jewelry was at least $300,000. When he picked up the jewelry from Lake Hill House, Chakonas told Ms. Stoll that he intended to turn over the jewelry to Sachdeva's lawyer. Chakonas never delivered the jewelry to Ms. Sachdeva's lawyer.

Instead, in approximately December 2010, he sent one piece (a pink sapphire pendent Ms. Sachdeva had purchased at Rohr Jewelers for $2,250) to his cousin in Florida. In late December, 2010, Chakonas lent some of the jewelry to a friend and represented that he had obtained the jewelry from his family. Chakonas also had several of the pieces of Ms. Sachdeva jewelry appraised and represented to the appraiser that he had obtained the jewelry from his family.

On February 21, 2011, Chakonas traveled to Leslie Hindman Auctioneers with Garret Gharibeh and displayed several pieces of the Sachdeva jewelry. Chakonas told Gharibeh that the jewelry belonged to his family and asked Gharibeh to sign the receipt for the jewelry left at Leslie Hindman Auctioneers. Chakonas ultimately left three pieces of jewelry, with a value of more than $30,000, at Leslie Hindman Auctioneers.

On March 4, 2010, Chakonas and Gharibeh again took several pieces of jewelry originally purchased by Ms. Sachdeva to Leslie Hindman Auctioneers. During this meeting, Chakonas represented that the jewelry had belonged to his grandmother. On this occasion, Chakonas left pieces of jewelry valued at more than $100,000 at Leslie Hindman auctioneers.

On March 8, 2011, Chakonas was arrested by the FBI. After his arrest, Chakonas acknowledged picking up Ms. Sachdeva's jewelry from Lake Hill House and Rohr Jewelers, but claimed that he immediately turned it over to Sachdeva. Chakonas maintained that shortly before Ms. Sachdeva turned herself in to begin serving her sentence (January 29, 2011), she gave Chakonas several pieces of jewelry and asked him to sell them for her. According to Chakonas, Ms. Sachdeva indicated she wanted the money to pay for a divorce attorney, to start a foundation to help people with bipolar disorder, and to provide her with money for her commissary account at prison.

At trial, Ms. Sachdeva denied Chakonas' claims and testified that she believed Chakonas had turned over the jewelry to her lawyer of the government and that she had not seen the jewelry since she originally purchased it.

When questioned about the Asian art pieces belonging to Father Baiardi, Chakonas initially claimed that the Asian items came from his apartment and were pieces that he had collected over time. When confronted with the fact that the items were actually owned by the Franciscan Friars, Chakonas claimed that they were previously owned by the Friars but he had purchased the items from them prior to the consignment. Chakonas also claimed that three or four of the items he had taken to the auction house actually had come from his parents. Chakonas then claimed that he had made a cash donation of approximately $500 to the Franciscan Mission and later sent a donation, by check, of approximately $2,000 some time around Christmas, 2010.

7

Chakonas then claimed that he had a oral agreement with the Franciscan Friar to sell the items and to pay the Franciscans 50 per cent of the sale proceeds. Chakonas told the FBI that he thought he had only received approximately $10,000 from the sale of the Asian items. When confronted with the fact that he had received more than $19,000, and that he had paid the Franciscans no more than $2,500, Chakonas simply indicated that he "had bills to pay."

This information is provided for the purpose of setting forth a factual basis for the defendant's pleas of guilty. It is not a full recitation of the defendant's knowledge of or participation in these offenses.

## PENALTIES

6. The parties understand and agree that the offense to which the defendant will plead guilty carries the following maximum term of imprisonment and fine: Twenty (20) years and $250,000. The charge also carries a mandatory special assessment of $100.00 and a maximum of up to three years of supervised release to follow any term of confinement.

7. The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes, as well as the applicable sentencing guidelines, with his attorney.

## DISMISSAL OF REMAINING COUNTS

8. The government agrees to move to dismiss the remaining counts of the indictment at the time of sentencing.

## ELEMENTS

9. The parties understand and agree that to sustain the charges of mail fraud, in violation of 18 U.S.C. § 1341, as set forth in count five of the indictment, the government must prove each of the following propositions beyond a reasonable doubt:

8

First, that the defendant knowingly devised or participated in a scheme to defraud, as charged; and

Second, that the defendant did so with the intent to defraud; and

Third, the scheme to defraud involved a materially false or fraudulent pretense, representation, or promise; and

Fourth, that for the purpose of carrying out the scheme or attempting to do so, the defendant caused the use of the United States Mails, in the manner charged.

## SENTENCING PROVISIONS

10. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12. The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions that they believe to be applicable to the offenses charged in the indictment. The defendant acknowledges and agrees that his attorney, in turn, has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13. The parties acknowledge and understand that, prior to sentencing, the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties

acknowledge, understand, and agree that the defendant may not move to withdraw his guilty pleas solely as a result of the sentencing court's determination of defendant's criminal history.

## Sentencing Guidelines Calculations

14. The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

15. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge will consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which defendant is pleading guilty.

16. The defendant acknowledges that the government asserts that the loss associated with the defendant's criminal conduct should include both the value of the jewelry purchased by Sujata Sachdeva that the defendant attempted to sell, which had a value of approximately $300,000, as well as the value of the Asian art items the defendant obtained from the Franciscan Mission, which had a value of approximately $19,000. The defendant has reserved the right to argue that the loss amount should be limited to the value of the Asian art items.

### Base Offense Level

17. The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in count four is 7 under Sentencing Guidelines Manual § 2B1.1(a)(1).

### Specific Offense Characteristics

18. The parties acknowledge that, based on its position that the loss amount associated with the defendant's criminal conduct is more than $200,000 but less than $400,000, the government will recommend to the sentencing court that the defendant's base offense level should be increased 12 levels under Sentencing Guidelines Manual §2B1.1(b)(1)(G).

19. The defendant believes that the loss amount associated with is criminal conduct should be limited to approximately $19,000, which is the loss associated with his conversion of the Asian art items obtained from the Franciscan Missions. Accordingly, the defendant contends that, under Sentencing Guidelines Manual §2B1.1(b)(1)(C), his base offense level should be increased only 4 levels.

### Acceptance of Responsibility

20. The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility.

### Sentencing Recommendations

21. Both parties reserve the right to apprise the district court and the probation office of any and all information that might be pertinent to the sentencing process, including but not limited

11

to any and all conduct related to the offense, as well as any and all matters that might constitute aggravating or mitigating sentencing factors.

22. The government agrees to recommend a sentence within the applicable sentencing guideline range, as determined by the sentencing court. Recognizing that the Sentencing Guidelines are merely advisory, the defendant has reserved the right to argue for a sentence below the applicable sentencing guideline range.

## Court's Determinations at Sentencing

23. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

24. The parties acknowledge, understand, and agree that the defendant may not move to withdraw his guilty pleas solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

25. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable upon entry of the judgment of conviction. The defendant agrees not to request any delay or stay in payment of any and all financial obligations.

26. The defendant agrees that, during the period of any supervision (probation or supervised release) imposed by the court in this case, the defendant will provide the Financial Litigation Unit (FLU) of the United States Attorney's Office with completed financial forms which will be provided by FLU, and will provide any documentation required by those forms. The defendant will provide FLU with such completed financial forms with required documentation within the first two months of supervision, at six month intervals thereafter during supervision, and within the last six months of scheduled supervision.

## Special Assessment

27. The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

## DEFENDANT'S WAIVER OF RIGHTS

28. In entering this agreement, the defendant acknowledges and understands that in so doing he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

    a. If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

    b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government

establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

    c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

    d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

    e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

29. The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights.

30. The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

31. The defendant knowingly and voluntarily waives all claims he may have based upon the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

### Further Civil or Administrative Action

32. The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

### GENERAL MATTERS

33. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

34. The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

35. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of his conviction.

### EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

36. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate

any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

37.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 9-10-2013

*Antonio Chakonas*
ANTONIO CHAKONAS
Defendant

I am the defendant's attorney. I have carefully reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 9-10-13

MARTIN J. PRUHS
Attorney for Defendant

For the United States of America:

Date: 9/10/13

JAMES L. SANTELLE
United States Attorney

Date: 9/10/13

MATTHEW L. JACOBS
Assistant United States Attorney

17